1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

_____
                                                    )
SALMON SPAWNING &                 )
RECOVERY ALLIANCE,              )
WILD FISH CONSERVANCY,        )          No. C06-1462RSL
NATIVE FISH SOCIETY, and         )
CLARK-SKAMANIA FLYFISHERS,  )          ORDER DENYING PLAINTIFFS' MOTION
                                                    )          FOR SUMMARY JUDGMENT AND
                        Plaintiffs,         )          GRANTING DEFENDANTS'
                                                    )          CROSS-MOTION FOR SUMMARY
            v.                                      )          JUDGMENT
                                                    )
D. ROBERT LOHN, in his official     )
capacity, NATIONAL OCEANIC     )
AND ATMOSPHERIC                    )
ADMINISTRATION'S NATIONAL  )
MARINE FISHERIES SERVICE,      )
CARLOS M. GUTIERREZ, in his    )
official capacity, UNITED STATES   )
DEPARTMENT OF COMMERCE,    )
REN R. LOHOEFENER, in his official )
capacity, UNITED STATES FISH     )
& WILDLIFE SERVICE,                 )
DIRK KEMPTHORNE, in his official )
capacity, and UNITED STATES       )
DEPARTMENT OF THE INTERIOR, )
                                                    )
                        Defendants.        )
_____ )

22

## I.  INTRODUCTION

23

            This case concerns a challenge to two decisions by National Marine Fisheries Service

24

("NMFS") involving Puget Sound Chinook salmon:  the approval of a resource management

25

26

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

plan prepared by the Puget Sound Indian Tribes and the Washington Department of Fish and Wildlife ("WDFW"), and the biological opinion issued by NMFS regarding the effects of its decision to approve the plan.

The suit arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, for judicial review of a federal administrative action.  The matter comes before the Court on *Salmon Spawning & Recovery Alliance, et al.*'s (collectively  "plaintiffs") motion for summary judgment (Dkt. ##18, 19) and D. Robert Lohn, *et al.*'s (collectively "defendants" or "NMFS") cross-motion for summary judgment (Dkt. ##30, 31).  The Indian Tribes[1] and WDFW are also participating in this matter as *amici curiae*  (collectively "*amici*") and oppose plaintiffs' motion and support NMFS's cross-motion.  See Dkt. #28 (Memorandum of Amici Curiae Indian Tribes and WDFW); Dkt #36 (Reply Memorandum).

On March 13, 2008, the Court held a hearing on the motions and heard oral argument from counsel for plaintiffs, defendants, and *amici*.  For the reasons set forth below, the Court denies plaintiffs' motion for summary judgment and grants defendants' cross-motion for summary judgment.

## II.  DISCUSSION

### A.    Background

Salmon fishing in Puget Sound is regulated under the continuing jurisdiction of U.S. v. Washington (Case No. 70-9213) (W.D. Wash.).  In 1985, the court approved the Puget Sound Salmon Management Plan ("PSSMP") as a consent decree for management by the Northwest

---

[1]  The following Tribes have appeared as *amici curiae*:  the Jamestown S'Klallam Tribe, the Lower Elwha Klallam Tribe, the Lummi Nation, the Makah Tribe, the Muckleshoot Tribe, the Nisqually Tribe, the Nooksack Indian Tribe, the Port Gamble S'Klallam Tribe, the Puyallup Tribe of Indians, the Sauk-Suiattle Indian Tribe, the Skokomish Tribe, the Squaxin Island Tribe, the Swinomish Indian Tribal Community, and the Tulalip Tribes.  See Dkt. ##22, 26; see also Dkt. #27 (Order Regarding Participation of WDFW as *amici curiae*).

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT          -2-

1   Washington Treaty Tribes and the State of Washington (the "co-managers").  See AR 18.  The

2   co-managers manage salmon fisheries in Puget Sound and the Strait of Juan de Fuca.  See AR

3   196.  These fisheries include recreational, commercial, ceremonial, and subsistence fisheries in

4   both marine and freshwater areas.  Id.

5         The Puget Sound Chinook Evolutionary Significant Unit ("ESU") (*Oncorhynchus*

6   *tshawytscha*) is listed as threatened under the Endangered Species Act ("ESA").  See 50 C.F.R. §

7   223.102 (1999) (listing Puget Sound Chinook as threatened); see id. (2005) (defining locations

8   where they are listed).  On March 1, 2004, WDFW and the Puget Sound Indian Tribes

9   completed a multi-year plan for management of Puget Sound Chinook, titled *Comprehensive*

10  *Management Plan for Puget Sound Chinook: Harvest Management Component*.  See AR 15

11  (hereinafter the "RMP" or "Resource Management Plan").  The RMP proposes regulation of

12  commercial, recreational, ceremonial, and subsistence salmon fisheries potentially affecting the

13  Puget Sound Chinook ESU within the marine and freshwater areas of Puget Sound.  See AR 7 at

14  1.

15        The co-managers requested NMFS's approval of the RMP.  See AR 16 at 2.  As a result,

16  on April 15, 2004, NMFS published a notice of availability for public review and comment on

17  NMFS's evaluation of the RMP.  See AR 6; 69 Fed. Reg. 19975 (Apr. 15, 2004).  The comment

18  period closed on May 17, 2004.  Id.  On December 16, 2004, NMFS issued a Biological Opinion

19  ("BiOp") on its recommended decision to approve the RMP.  See AR 2.  On January 27, 2005,

20  NMFS staff submitted a recommended decision.  See AR 3 (the "ERD").  The ERD

21  recommended approval of the RMP.  Id. at 2.  On March 4, 2005, NMFS's Regional

22  Administrator approved the RMP.  See AR 4 at 5.  The same day, the Regional Administrator

23  issued a Record of Decision relating to its Environmental Impact Statement pursuant to the

24  National Environmental Policy Act ("NEPA").  See AR 5; 42 U.S.C. § 4332(C).  On March 11,

25

26  ORDER DENYING PLAINTIFFS' MOTION
    FOR SUMMARY JUDGMENT AND
    GRANTING DEFENDANTS' CROSS-
    MOTION FOR SUMMARY JUDGMENT          -3-

2005, NMFS announced its approval of the RMP and responded to comments received.  See AR 9; 70 Fed. Reg. 12194 (Mar. 11, 2005).  Under these approvals, the RMP has been approved by NMFS for the period May 1, 2005 through April 30, 2010.  Id.  In this action, plaintiffs challenge NMFS's approval of the RMP and the BiOp.

**B.   Analysis**

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, defines two distinct categories of protected species.  An "endangered" species is any species "which is in danger of extinction throughout all or a significant portion of its range."  Id. at § 1532(6).  In contrast, a "threatened" species is one that "is likely to become an endangered species within the foreseeable future."  Id. at § 1532(20).  Section 9 of the ESA prohibits "any person" from "taking" a species listed as endangered.  Id. at §1538.  "'Take' means to harrass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  Id. at § 1532(19).  By itself, section 9 does not prohibit the take of "threatened" species.  Section 4(d) of the ESA, however, allows agencies to apply section 9's prohibitions to "threatened" species.  Id. at § 1533(d) (stating "[w]henever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.  The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1) [16 U.S.C. § 1538(a)(1)], in the case of fish or wildlife . . . with respect to endangered species[.]").  These regulations are known as "Section 4(d) Rules."

On January 3, 2000, NMFS issued a final Section 4(d) Rule for Puget Sound Chinook. See 50 C.F.R. § 223.203 (2000).  This rule concluded that the take prohibitions applicable to endangered species are necessary and advisable for the conservation of the threatened Puget Sound Chinook.  See 65 Fed. Reg. 42422, 42423 (July 10, 2000).  NMFS, however, also

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -4-

concluded that it was not necessary and advisable to impose the take prohibitions to thirteen programs because the programs contribute to the conservation of the ESU. Id.  The conditions on which these programs are not subject to the section 9 "take" prohibition are referred to as "Limits." Id.; 50 C.F.R. § 223.203(b).  The relationship between two of these Limits—Limit 4 and Limit 6—is at the heart of plaintiffs' claims in this case.

**C.    Standard of Review**

Defendants' final agency actions[2] made pursuant to the ESA are reviewed in accordance with the APA.  Under the APA, a court may disturb an agency's final action only if that final action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This standard is "highly deferential, presuming agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Indep. Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000) (citation and quotation marks omitted). Courts are "deferential to the agency's expertise in situations, like that here, where 'resolution of this dispute involves primarily issues of fact.'" Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to the informed discretion of the responsible federal agencies.") (citations omitted)).  Therefore, the "reviewing court may set aside only those conclusions that do not have a basis in fact, not those with which it disagrees." Arizona Cattle Growers' Ass'n, 273 F.3d at 1236.  This deferential standard, however, does not shield

---

[2]  Defendants do not contest that the actions at issue in this case are "final agency actions" reviewable by the Court.  See Bennett v. Spear, 520 U.S. 154, 177-78 (1997); see also Nat'l Wildlife Fed'n  v. Nat'l Marine Fisheries Serv., 481 F.3d 1224, 1231 (9th Cir. 2007) (holding that the issuance of a biological opinion is considered a final agency action, and therefore subject to judicial review) (citing Bennett, 520 U.S. at 178); Sierra Club v. Marsh, 816 F.2d 1376, 1384-85, 1388-89 (9th Cir. 1987) (failure to reinitiate consultation is reviewable).

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -5-

the agency from a "thorough, probing, in-depth review" by the Court.  <u>Seattle Audubon Soc'y v. Moseley</u>, 798 F. Supp. 1473, 1476 (W.D. Wash. 1992) (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971).  "Judicial review is meaningless," unless the Court carefully reviews the record "to 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" <u>Arizona Cattle Growers' Ass'n</u>, 273 F.3d at 1236 (quoting <u>Marsh</u>, 490 U.S. at 378).

The parties in this case have filed cross-motions for summary judgment.  "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the court does not employ the standard of review set forth in Rule 56."  <u>Maine v. Norton</u>, 257 F. Supp. 2d 357, 363 (D. Me. 2003) (citing <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985)).

**D.   Plaintiffs' Claims**

Plaintiffs move for summary judgment on three primary issues, claiming that:  (1) NMFS violated the APA and section 7 of the ESA (16 U.S.C. § 1536) when it approved the RMP; (2) NMFS violated section 7 in adopting a BiOp evaluating the impact of approving the RMP on threatened Puget Sound Chinook; and (3) NMFS acted unlawfully by failing to reinitiate consultation on the BiOp concerning the RMP in light of new information regarding the impact of the harvest on Puget Sound Chinook.  <u>See</u> Dkt. #18 at 1-2; Dkt. #19 at 2.  The Court reviews plaintiffs' claims, under the applicable abuse of discretion standard, in turn, below.

**1.      The Resource Management Plan ("RMP")**

Before turning to plaintiffs' specific claims, the Court notes that this is not the first case in this judicial district concerning § 223.203(b)'s Limits.  In <u>Washington Envtl. Council v. NMFS</u> (Case No. C00-1547R), the plaintiffs claimed that NMFS did not have the authority to

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -6-

create a limited take prohibition under the Section 4(d) rules.  <u>Washington Envtl. Council v.</u>

<u>NMFS</u>, 2002 U.S. Dist. Lexis 5432, at *21 (W.D. Wash. Feb. 26, 2002).  Unlike the plaintiffs in

<u>Washington Envtl. Council</u>, however, plaintiffs here do not challenge NMFS's authority to

promulgate the Limits at issue in this case or the rules themselves.[3]  <u>Cf.</u> <u>Christy v. Hodel</u>, 857

F.2d 1324, 1336 (9th Cir. 1988) (holding that the 4(d) Rules do not unconstitutionally delegate

legislative authority to the Secretary).  Rather, plaintiffs here challenge NMFS's interpretation

and application of these Limits in approving the RMP.  <u>See, e.g.</u>, Dkt. #19 at 22 ("NMFS

interpreted 'viable' to mean only that population of fish that NMFS estimates is the current

carrying capacity of the relevant habitat.").   The first interpretive conflict between the parties

concerns which Limit governs NMFS's actions.

Plaintiffs assert that Limit 4 governs this case.  <u>See</u> Dkt. #34 at 3-4.   In contrast, NMFS

contends that its actions should be judged by Limit 6's criteria.  <u>See</u> Dkt. #30 at 17 ("[C]ontrary

to Plaintiffs' claim, NMFS's determination is governed by the requirements of Limit 6, rather

than the requirements of Limit 4."); AR 3 at 2 (applying Limit 6's criteria).

---

[3]  <u>See</u> <u>id.</u> at *23 (denying plaintiffs' claim that NMFS does not have authority to create a limited take provision, stating:  "The language of 4(d) makes it clear that NMFS 'may' impose a take prohibition. . . .  It is logically within the agency's discretion, therefore, that applying any number of different varieties of (otherwise legal) take prohibitions is also within NMFS's discretion.  The court is not persuaded that choosing to promulgate a limited take prohibition under § 4(d) was arbitrary and capricious. . . .  The court, emphasizes that its ruling upholding NMFS's statutory authority to use § 4(d) to promulgate a limited take prohibition in no way is intended to sanction the substance of the rule, let alone the science of the [Forests and Fish Report].  The court, as discussed above, finds a ruling on whether the rule meets the conservation mandate of the ESA to be premature at this time.").

Plaintiffs here have not challenged whether the substance of § 223.203(b) furthers a conservation purpose, but rather NMFS's interpretation of § 223.203(b)'s Limits as applied to the approval of the RMP.  <u>Cf.</u> <u>Sierra Club v. Clark</u>, 755 F.2d 608, 615 (8th Cir. 1985) (facially invalidating regulation allowing sport trapping of the Eastern Timber Wolf on the ground that it exceeded the scope of the Secretary's authority to provide for the "conservation" of threatened species under 16 U.S.C. § 1533(d) and § 1552(3) (defining "conservation")).

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -7-

Based on the plain language of Limit 6, and for the reasons articulated below, the Court concludes that Limit 6 applies here and NMFS did not act arbitrarily and capriciously by reviewing the RMP under Limit 6.  Limit 6 provides:

(6) The prohibitions of paragraph (a) [the "take" prohibitions of section 9(a)(1) of the ESA] of this section relating to threatened species of salmonids listed in [50 C.F.R.] § 222.102(a) [including Puget Sound Chinook] do not apply to actions undertaken in compliance with a resource management plan developed jointly by the States of Washington, Oregon and/or Idaho and the Tribes (joint plan) within the continuing jurisdiction of United States v. Washington [384 F. Supp. 312 (W.D. Wash. 1974)] or United States v. Oregon, the on-going Federal court proceedings to enforce and implement reserved treaty fishing rights, provided that:

(i) The Secretary has determined pursuant to 50 CFR 223.209 [amended as § 223.204; see 70 Fed. Reg. 37160, 37203 (June 28, 2005)] and the government-to-government processes therein that implementing and enforcing the joint tribal/state plan will not appreciably reduce the likelihood of survival and recovery of affected threatened ESUs.

(ii) The joint plan will be implemented and enforced within the parameters set forth in United States v. Washington or United States v. Oregon.

(iii) In making that determination for a joint plan, the Secretary has taken comment on how any fishery management plan addresses the criteria in § 223.203(b)(4) [Limit 4], or on how any hatchery and genetic management plan addresses the criteria in § 223.203(b)(5).

(iv) The Secretary shall publish notice in the Federal Register of any determination whether or not a joint plan, will appreciably reduce the likelihood of survival and recovery of affected threatened ESUs, together with a discussion of the biological analysis underlying that determination.

(v) On a regular basis, NMFS will evaluate the effectiveness of the joint plan in protecting and achieving a level of salmonid productivity commensurate with conservation of the listed salmonids.  If the plan is not effective, then NMFS will identify to the jurisdiction ways in which the joint plan needs to be altered or strengthened.  If the responsible agency does not make changes to respond adequately to the new information, NMFS will publish notification in the Federal Register announcing its intention to withdraw the limit on activities associated with that joint plan.  Such an announcement will provide for a comment period of no less than 30 days, after which NMFS will make a final determination whether to withdraw the limit so that take prohibitions would then apply to that joint plan as to all other activity not within a limit.

50 C.F.R. § 223.203(b)(6).

Limit 6 expressly states that it applies to resource management plans developed "jointly

by the State[] of Washington . . . and the Tribes within the continuing jurisdiction of United States v. Washington." Id.  The challenged actions here are directed at NMFS's review of the RMP, which was prepared jointly by the Tribes and WDFW in light of United States v. Washington.  See AR 15 at 5 (stating "[t]he management regime will be guided by the principles of the Puget Sound Salmon Management Plan (PSSMP), and other legal mandates pursuant to U.S. v. Washington. . . .  The PSSMP is the framework for planning and managing harvest so that treaty rights will be upheld and equitable sharing of harvest opportunity and benefits are realized.").  Although not binding on the Court, the RMP itself states that it was prepared for review under Limit 6.  Id. at 2 ("This Plan will be submitted to . . . NMFS, for evaluation under the conservation standards of the Endangered Species Act.  Criteria for exemption of state / tribal resource management plans from prohibition of the 'take' of listed species, are contained under Limit 6 of the salmon 4(d) Rule.").

The Court rejects plaintiffs' argument that Limit 4 provides the "general requirements" for management plans and that Limit 6 simply provides "additional requirements" for a jointly prepared state-tribal RMP.  See Dkt. #19 at 4.  Each Limit is directed at a specific program.  See 65 Fed. Reg. 42422, 42423-24 (July 10, 2000) (preamble to final regulation).  Limit 4 expressly applies to state Fishery Management and Evaluation Plans ("FMEP").  See 50 C.F.R. § 223.203(b)(4).  In contrast, Limit 6 applies to RMPs like the one at issue in this case, prepared jointly by the State and Tribes under United States v. Washington.  Id. at § 223.203(b)(6).  As NMFS explained in the proposed rule, where a joint agreement between a state and tribe is required, Limit 6 applies.  See 65 Fed. Reg. 170, 177 (Jan. 3, 2000) ("Agreements adopted within the United States v. Washington proceeding, such as the Puget Sound Management Plan (originally approved by the court in 1977; most recent amendment approved by the court in United States v. Washington, 626 F. Supp. 1405, 1527 (1985, W.D. Wash.)[)] mandate that harvest and artificial production management actions are agreed to and coordinated between the

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                -9-

1    State of Washington and the Western Washington treaty tribes.  Where joint agreement is

2    required, such plans will fall under the provisions of paragraphs (b)(6)(i)-(iv) [Limit 6] of

3    section 223.203 contained in this proposed rule.").

4        Under Limit 6, the overall standard for NMFS's approval of the RMP is a determination

5    that the RMP "will not appreciably reduce the likelihood of survival and recovery of affected

6    threatened ESUs."  50 C.F.R. § 223.203(b)(6)(i).  Therefore, the Court's overall determination

7    in this case is whether NMFS was arbitrary and capricious in determining that the RMP would

8    not appreciably reduce the likelihood and survival of Puget Sound Chinook.  This, however,

9    does not end the inquiry regarding the applicability of Limit 4 because Limit 6 expressly states

10   that in making a determination that the joint plan is exempt from section 9's take prohibitions,

11   "the Secretary has taken comment on how any fishery management plan addresses the criteria in

12   [Limit 4]."  50 C.F.R. § 223.203(b)(6)(iii).  Limit 4 contains nine separate "criteria" that must be

13   adequately addressed by a plan.  These nine "criteria" are listed as (A) through (I) under §

14   223.203(b)(4)(i) in Limit 4.  See 50 C.F.R. § 223.203(b)(4)(i) (stating "[t]he plan must

15   adequately address the following criteria" and then enumerating nine criteria in §

16   223.203(b)(4)(i)(A) - (I)).

17       Plaintiffs contend that NMFS failed to adequately address three of Limit 4's criteria in

18   approving the RMP:  criteria B, criteria C, and criteria H.  The Court addresses plaintiffs'

19   arguments with respect to each criteria, separately, below.

20            a.    **Limit 4—Criteria B**

21       Because the bulk of plaintiffs' case against defendants is directed at NMFS's alleged

22   failure to adequately address criteria B, the Court quotes the text of criteria B in full, below:

23       The plan must adequately address the following criteria: . . . (B) Utilize the
24       concepts of "viable" and "critical" salmonid population thresholds, consistent with
         the concepts contained in the technical document entitled "Viable Salmonid
25       Populations (NMFS, 2000b)."  The VSP paper provides a framework for
         identifying the biological requirements of listed salmonids, assessing the effects of

26   ORDER DENYING PLAINTIFFS' MOTION
     FOR SUMMARY JUDGMENT AND
     GRANTING DEFENDANTS' CROSS-
     MOTION FOR SUMMARY JUDGMENT            -10-

management and conservation actions, and ensuring that such actions provide for the survival and recovery of listed species. Proposed management actions must recognize the significant differences in risk associated with viable and critical population threshold states and respond accordingly to minimize the long-term risks to population persistence. Harvest actions impacting populations that are functioning at or above the viable threshold must be designed to maintain the population or management unit at or above that level. For populations shown with a high degree of confidence to be above the critical levels but not yet at viable levels, harvest management must not appreciably slow the population's achievement of viable function. Harvest actions impacting populations that are functioning at or below [the] critical threshold must not be allowed to appreciably increase genetic and demographic risks facing the population and must be designed to permit the population's achievement of viable function, unless the plan demonstrates that the likelihood of survival and recovery of the entire ESU in the wild would not be appreciably reduced by greater risks to that individual population.

50 C.F.R. § 223.203(b)(4).

### (i)     Viability concept

Plaintiffs' first contention under criteria B is that in approving the RMP, NMFS departed from what constitutes a "viable" salmonid population threshold as that concept is defined in the technical document titled "Viable Salmonid Populations (NMFS, 2000b)." See Dkt. #19 at 21; AR 241 (NOAA Technical Memorandum NMFS-NWFSC-42; "Viable Salmonid Populations and the Recovery of Evolutionary Significant Units") (hereinafter the "VSP"). The purpose of the VSP "is to provide an explicit framework for identifying attributes of viable salmonid populations so that parties may assess the effects of management and conservation actions and ensure that their actions promote the listed species' survival and recovery." AR 241 at 1. The VSP defines "viable salmonid population" as "an independent population of any Pacific salmonid (genus *Oncorhynchus*) that has a negligible risk of extinction due to threats from demographic variation (random or directional), local environmental variation, and genetic diversity changes (random or directional) over a 100-year time frame." Id. at 2.

Plaintiffs' primary contention regarding criteria B of Limit 4 is that NMFS redefined "viable" in its approval of the RMP to mean the carrying capacity of current habitat conditions,

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -11-

and therefore produced a "viable" threshold smaller than that intended by the Limit 4 and the VSP, and did not consider the risk of extinction.  See Dkt. #19 at 22.  Plaintiffs' claims are founded on the principle that NMFS was required to apply the definition of "viable" as defined in the VSP when evaluating the RMP.  See Dkt. #34 at 10 ("By judging the impacts of the Harvest Plan [RMP] using viability thresholds that are not an indication of extinction risk, NMFS failed to assure that the [RMP] uses the concept of 'viable' in a way that is consistent with the VSP Paper, as required by [Limit 4].  Its decision was, therefore, contrary to law, and so a violation of the APA.").  The Court, concludes, however that NMFS satisfied the requirements of Limit 6 in considering criteria B of Limit 4.

First, Limit 6 only expressly requires that NMFS has "taken comment on how any fishery management plan addresses the criteria in § 223.203(b)(4) [Limit 4]."  In approving the RMP, NMFS did in fact take comment on the Limit 4 criteria.  See AR 9.

Second, criteria B of Limit 4 does not mandate that an RMP must use a particular "viable" or "critical" threshold.  Criteria B of Limit 4 only requires that the "concepts of 'viable' and 'critical' salmonid population thresholds" are "consistent with the concepts" in the VSP.  50 C.F.R. § 223.203(b)(4)(i)(B).  Although plaintiffs attempt to convert the VSP itself into a proscriptive standard, in promulgating the 4(d) Rules, NMFS explicitly stated that the documents cited in the Limits were meant to provide guidance, not to create binding criteria.  In the preamble to the final rule for example, NMFS states: "These technical documents [cited in § 223.203] provide guidance to entities as they consider whether to submit a program for a 4(d) limit.  The documents represent several kinds of guidance, and are not binding regulations requiring particular actions by any entity or interested party."  65 Fed. Reg. 42422, 42424 (July 10, 2000) (emphasis added).  With respect to the cited technical documents in the Limits, the preamble to the final rule goes on to conclude that "where the rule cites a document, a program's consistency with the guidance is 'sufficient' to demonstrate that the program meets the particular

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -12-

purpose for which the guidance is cited.  However, the entity or individual wishing a program to be accepted as within a particular limit has the latitude to show that its variant or approach is, in the circumstances where it will apply and affect listed fish, equivalent or better."  Id. (emphasis added).

Furthermore, the VSP does not mandate any particular standard or methodology.  Instead, it consists of two components:  (1) principles for identifying population substructure in Pacific salmonid ESUs; and (2) general principles for establishing biological guidelines to evaluate the conservation status of these populations.  See AR 241 at 2.  The VSP Paper identifies four parameters for evaluating the conservation status of a population, including:  (1) abundance, (2) growth rate or productivity, (3) spatial structure, and (4) diversity that are "reasonable predictors" of viability.  Id. at 11.  The VSP Paper also provides general guidelines for evaluating each of these parameters.  Id. at 14-15.  Additionally, as criteria B in Limit 4 expressly states, the VSP is a "framework" for evaluating viable populations, it does not mandate how these evaluations must be applied.  Thus, plaintiffs' claim that NMFS acted contrary to law by failing to specifically use the definition of "viable" as defined by the VSP is unavailing.

### (ii)    Extinction risk

The Court also rejects plaintiffs' contention that NMFS failed to consider extinction risk in assessing the RMP.  See Dkt. #19 at 22 ("Avoiding extinction was not part of NMFS's equation"); #34 at 10 ("By judging the impacts of the Harvest Plan [RMP] using viability thresholds that are not an indication of extinction risk, NMFS failed to assure that the [RMP] uses the concept of 'viable' in a way that is consistent with the VSP Paper, as required by [Limit 4].").  In its decision, NMFS founded its evaluation of the RMP based on the VSP and a paper entitled "A Risk Assessment Procedure for Evaluating Harvest Mortality on Pacific Salmonids" (the "RAP").  See AR 3 at 7; 24.  The RAP, dated May 30, 2000, was developed

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

contemporaneously with the VAP.[4]  See AR 58 (RAP).  The RAP was developed to provide a management tool linking "available biological data about the listed species with quantified standards of acceptable risk to survival and recovery."  AR 58 at 2.  The RAP was also expressly developed consistent with the concepts of the VSP Paper.  See id. at 4.  In its decision, by utilizing the RAP, NMFS used viable and critical thresholds to identify rebuilding exploitation rates ("RERs").  See AR 3 at 7; 25.  As set forth in the RAP, the RER is the maximum rate of harvest by which:  (1) the percentage of escapements below the critical threshold must differ no more than 5% from that under the baseline conditions [or, a no-fishing scenario]; and (2) either the viable threshold must be met 80% of the time, or the percentage of escapements less than the viable threshold must differ no more than 10% from that under the baseline [no-fishing] condition."  AR 58 at 9-10.  Significantly here, the RERs assess extinction risk because the critical threshold is the point of population instability below which the risk of extinction increases.  See AR 7 at C-6.  Therefore, contrary to plaintiffs' contention, NMFS applied specific thresholds as part of its evaluation to assess the risk of extinction.

### (iii)    Carrying capacity and current habitat conditions

Plaintiffs also contend that NMFS's use of a current conditions viability threshold departs from the VSP and is therefore contrary to law.  See Dkt. #34 at 5 ("By defining 'viability' based on current carrying capacity, NMFS departed from the concept of 'viable thresholds' articulated in the VSP Paper, and also departed from the requirements of the 4(d) Rule."); 9.  In response to

---

[4]  NMFS described the relationship between the VSP and the RAP in the RAP itself, stating: "Both RAP and VSP operate at the population level.  However, although VSP offers general guidelines for biological characteristics of a population at increased risk or robust to risk, it is not population specific and it does not assess an action's effects over time.  Consequently, models are needed that look at population-specific population dynamics and the effects of proposed actions over time.  The result is a merging of the thresholds of risk, e.g., VSP, with the effects of an action over time to assist in making management decisions, e.g., RAP."  AR 58 at 4 (emphasis added).

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT            -14-

1  this claim, NMFS correctly asserts that the VSP itself recognizes that "carrying capacity"[5] is an

2  important part of its viability framework:  "[c]apacity parameters are important for evaluating

3  population viability in that they describe the scope for a population or some component of a

4  population to exceed requisite abundance thresholds."  AR 241 at 69.  Therefore, NMFS's use

5  of carrying capacity is consistent with the concepts in the VSP Paper.

6      Additionally, under the ESA and the 4(d) Rule at issue here, § 223.203(b)(6), the ultimate

7  issue is whether operation of the plan will not appreciably reduce the likelihood of survival and

8  recovery of the species.  See Nat'l Wildlife Fed'n, 481 F.3d at 1236.  The specific requirement

9  in criteria B of Limit 4 requires that implementation of harvest plans must not "appreciably

10  slow" the population's achievement of "viable function" with respect to populations above the

11  critical threshold but below viable levels.  50 C.F.R. § 223.203(b)(4)(i)(4).  To the extent

12  recovery, or achievement of viable populations, is limited by current habitat conditions, it cannot

13  be said that the operation of the RMP at issue in this case is appreciably reducing the likelihood

14  of recovery or slowing the achievement of viable populations.  See Dkt. #36 at 6 (Amici Reply).

15  NMFS's recognition of current conditions for the five-year RMP at issue is appropriate given

16  that in developing the RAP, NMFS acknowledged that "the effect of changes in land use and the

17  improvements from current restoration efforts won't be measurable for at least another 20 years"

18  and therefore "it is reasonable to assume that conditions in the next twenty to thirty years might

19  be similar to those observed over the past 10-15 years."  AR 58 at 10.  As NMFS notes in its

20  reply, given the uncertainty of when, and if at all, habitat improvements may be made, "[u]sing

21  current conditions provides a realistic and more conservative evaluation of these effects and

22  facilitates recovery if the hoped-for habitat improvements occur."  Dkt. #35 at 9; see Nat'l

23

24      [5] Carrying capacity measures "the size of a population sustainable by the environment."  AR 241

25  at 68.

26  ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT          -15-

Wildlife Fed'n, 481 F.3d at 1235 (requiring NMFS to consider proposed operations in their "actual context").  For these reasons, NMFS's use of current habitat conditions in assessing the RMP was not arbitrary and capricious or contrary to law.

### (iv)   Technical Recovery Team (TRT) thresholds

Finally, plaintiffs argue that NMFS failed to use its Technical Recovery Team's ("TRT")[6] viable population ranges to evaluate the RMP thresholds, and instead developed its own thresholds based on current habitat conditions.  See Dkt. #19 at 7-8; Dkt. #34 at 15 ("Plaintiffs fault NMFS for failing to listen to the agency's own experts—in particular, the Technical Recovery Team that NMFS appointed to develop recovery criteria for Puget Sound Chinook."); 25.

Contrary to plaintiffs' contentions, however, NMFS considered the TRT planning ranges in its decision on the RMP and explained why they were not applicable to the RAP analysis of the RMP.  See AR 3 at 66 ("The preliminary delisting and recovery criteria recommendation provided by the TRT . . . have been used to assist in the evaluation of the harvest management strategy represented by the RMP."); 37 ("However, the trend in natural-origin returns, when compared with hatchery returns, into several systems suggests that marine, freshwater, and estuary habitat quality and quantity is the primary constraint on productivity.").  In its decision,

---

[6] NMFS has explained the function of the TRT as follows:  "As part of its recovery planning efforts, NMFS Northwest Region designated 'recovery domains' in the Pacific Northwest.  Puget Sound is one of five geographically based recovery domains for preparing recovery plans for listed salmon species. . . .  For each domain, NMFS convened an independent Technical Recovery Team (TRT) to develop recommendations on biological viability criteria for the ESU and its component populations, to make technical findings regarding limiting factors, to provide scientific support to local and regional recovery planning efforts, and to provide scientific evaluations of recovery plans.  The TRT for the Puget Sound Chinook (PSTRT) includes biologists from NMFS, state, tribal, and local agencies."  AR 270 at 3. Also contrary to plaintiffs' contention, the TRT cannot reasonably be considered its "own" expert when only two of the seven members on the team are from NMFS.  See AR 70-1 at 1 (listing the seven PSTRT members).

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                   -16-

NMFS explained why it did not apply the TRT planning ranges.  <u>See</u> AR 3 at 25 ("For most populations, these [viable and critical] thresholds are well below the escapement levels associated with recovery, but achieving these goals under current conditions is a necessary step to eventual recovery when habitat and other conditions are more favorable.").

Second, as NMFS correctly asserts in its reply, NMFS did not utilize the TRT as an "expert" to assist in evaluation of RMPs, nor did the TRT review or comment on the RMP at issue in this case.  <u>See</u> Dkt. #35 at 5.

Third, NMFS is entitled to deference in its consideration of the TRT planning ranges for purposes of approving the RMP.  <u>See</u> <u>Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.</u>, 378 F.3d 1059, 1066 (9th Cir. 2004) (deferring to agency's scientific judgment).  The cases cited by plaintiffs are inopposite here because in its decision approving the RMP, NMFS offered a credible explanation of its decision to develop thresholds under the RAP rather than use the TRT planning ranges.  <u>Cf.</u> <u>N. Spotted Owl v. Hodel</u>, 716 F. Supp. 479, 483 (W.D. Wash. 1988) (stating that the court "will reject conclusory assertions of agency 'expertise' where the agency spurns unrebutted expert opinions without itself offering a credible alternative explanation."); <u>Defenders of Wildlife v. Babbitt</u>, 958 F. Supp. 670, 685 (D.D.C. 1997) (declining to defer to the agency because its decision was based on unsupported conclusory allegations and facts directly contradicted by undisputed evidence in the record); Dkt. #34 at 16 (citing <u>N. Spotted Owl</u> & <u>Defenders of Wildlife</u>).

Here, in approving the RMP, NMFS considered the TRT preliminary planning ranges and explained why they were not applicable to the RAP analysis of the RMP.  For the reasons set forth above, the Court concludes that NMFS's decision was not arbitrary and capricious.

> **b.**     **Limit 4—Criteria C**

Plaintiffs make an alternative argument concerning NMFS's use of current carrying capacity connected to criteria C in Limit 4.  Plaintiffs contend that even using a current

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

conditions definition of viable, NMFS acted contrary to the recovery requirement of criteria C in Limit 4, which states that "exploitation rates must not appreciably reduce the likelihood of survival and recovery of the ESU," because two of the five regions—the Georgia Strait and Hood Canal—do not have populations headed for viability.  See Dkt. #19 at 25-26; 50 C.F.R. § 223.203(b)(i)(C).

The TRT guidelines provide that an ESU-wide recovery should include two to four viable populations in each of the five geographic regions within Puget Sound, depending on the historical biological characteristics and acceptable risk levels for populations within each region. See AR 70-01 at 12; AR 3 at 66-68.  The Georgia Strait Region has two populations:  the North and South Fork Nooksack River populations.  See AR 3 at 68.  Although NMFS found that these populations had an elevated level of risk when compared to NMFS's standards, NMFS ultimately concluded based on a number of factors that implementation of the RMP "will adequately protect chinook salmon populations in the Georgia Strait Region."  AR 3 at 68-70. NMFS based its conclusion on several findings, including that both populations in the Georgia Strait exhibited increasing escapement trends since listing (see AR 3 at 29), and that hatchery-origin spawners contributed to the natural spawning areas by buffering harvest-induced genetic risks to the populations.  Id.

The Hood Canal region consists of two populations:  the Skokomish and Mid-Hood Canal River populations.  See AR 3 at 74.  NMFS ultimately concluded for these populations that "the RMP's management objectives are adequately protective of the geographic, life history, and diversity of the populations within the Hood Canal Region of the ESU."  Id. at 76.  NMFS supported its conclusion based on several factors, including the total abundance status of the population, the increasing escapement trend observed for the population, and the annual monitoring and evaluation actions outlined in the RMP.  See id.  Additionally, NMFS found that the production of hatchery-origin fish sharing the ecological and genetic traits of the natural-

origin population may buffer risk to the population.  Id.

Plaintiffs also contend that NMFS has not shown that the Cedar and Sammamish River populations would be sustained and improved under the RMP.  See Dkt. #19 at 25-26.  These two populations comprise two of the six populations in the South Puget Sound Region.  See AR 3 at 72.  Contrary to plaintiffs' assertion however, NMFS specifically found that "the proposed RMP is anticipated to contribute to the stabilization or rebuilding of all populations within this region."  Id. (emphasis added).  It is true that NMFS identified a concern for the Cedar and Sammamish River populations, but NMFS also stated that "[i]dentifying these two populations as a concern is considered a precautionary approach, as information suggests that the escapements estimated for these systems are likely conservative."  Id. at 74.  Plaintiffs have failed to point to anything in the record justifying their contention that these populations will not be sustained under the RMP.  See Dkt. #19 at 26.  NMFS ultimately concluded that "[t]he concerns for the Cedar River and Sammamish River populations do not represent much risk to the region. . . .  [and that] NMFS believes that the RMP's management objectives are adequately protective of the geographic distribution, life history characteristics, and genetic diversity of the populations within the South Puget Sound Region of the ESU."  AR 3 at 74.

For the foregoing reasons, the Court concludes that NMFS's determinations with respect to the populations referenced above are entitled to deference, and that NMFS did not act arbitrarily or capriciously in its consideration of the recovery requirement of criteria C in Limit 4.

### c.     Limit 4—Criteria H

Criteria H of Limit 4 states that a management plan must adequately address "restrictions on resident and anadromous species fisheries that minimize any take of listed species, including time, size, gear, and area restrictions."  50 C.F.R. § 223.203(b)(4)(i)(H).  Plaintiffs contend that NMFS failed to evaluate whether allowing the Puget Sound fisheries to harvest at the "critical

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -19-

exploitation rate ceilings" would comply with Rule 4(d), and failed to evaluate whether introducing widespread use of mark-selective fishing would minimize the take of Puget Sound Chinook in criteria H.  See Dkt. #19 at 26-27; Dkt. #34 at 18-19.

Contrary to plaintiffs' assertion, NMFS expressly did evaluate whether the RMP would comply with criteria H in Limit 4.  Under the section of its decision addressing criteria H, NMFS states that "[t]he RMP's rebuilding exploitation rates, upper management thresholds, low abundance thresholds, and the critical exploitation rates ceilings are the primary elements of the harvest plan.  Time, size, gear, and area and retention restrictions are all among the actions taken to ensure that salmon fishing-related mortality is consistent with these management objectives. . . .  Actions the co-managers have taken in the past and that will be considered under the RMP to protect listed species include:  closures in the April, May, and June recreational fisheries and size limits to protect spring chinook salmon; closed spawning grounds to fishing; and required non-retention of chinook salmon."  AR 3 at 84-85.

Nevertheless, plaintiffs specifically contend that NMFS failed to "evaluate whether introducing widespread use of mark-selective fishing . . . would further minimize the take of threatened Chinook, as required by the 4(d) Rule" and thereby "effectively excised this requirement from the regulations."  Dkt. #19 at 26-27.  First, there is no express requirement in criteria H that NMFS must consider the use of "mark-selective fishing."  See 50 C.F.R. § 223.203(b)(4)(i)(H).  In its decision, NMFS did address restrictions that minimize take under criteria H.  Second, in response to comments made by plaintiff Washington Trout to the Draft Environmental Impact Statement, in the Final Environmental Impact Statement NMFS acknowledged that the co-managers are testing mark-selective fishing in some fisheries, and "[d]epending on the success of these fisheries, they might be expanded in the future."  AR 7 (FEIS) at 3-65; see Dkt. #30 at 27.  For these reasons, the Court concludes that NMFS's determination that the RMP adequately addressed the requirements of criteria H in Limit 4 is not

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT          -20-

1    arbitrary or capricious.

2        **2.      The Biological Opinion ("BiOp")**

3           Under the ESA, after consultation under 16 U.S.C. § 1536(a), the agency must prepare a

4    biological opinion.  See 16 U.S.C. § 1536(b)(3)(A).  The biological opinion must include a

5    "detailed discussion of the effects of the action on listed species or critical habitat" and NMFS's

6    "opinion on whether the action is likely to jeopardize the continued existence of a listed species

7    or result in the destruction or adverse modification of critical habitat," (a "jeopardy biological

8    opinion"), or whether the proposed action poses no such danger (a "no jeopardy biological

9    opinion.").  50 C.F.R. § 402.14(h)(2); (3). The BiOp here was approved on December 16, 2004

10   and considered the impact of NMFS's determination as to whether the RMP satisfied the ESA

11   4(d) Rule on the listed Puget Sound Chinook.  See AR 4-3 at 2; 4.  In this case, plaintiffs

12   contend that the BiOp is contrary to law because it applied the wrong "jeopardy" standard and

13   failed to use the best available science as required by the ESA.  See Dkt. #19 at 27.  The Court

14   considers plaintiffs' two claims with respect to the BiOp, below.

15       **a.      Jeopardy standard**

16          "Jeopardize the continued existence of" is defined to mean "[a]n action that reasonably

17   would be expected, directly or indirectly, to reduce appreciably the likelihood of both the

18   survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or

19   distribution of that species."  50 C.F.R. § 402.02.  Plaintiffs contend that NMFS's no-jeopardy

20   determination in the BiOp is contrary to law "because it does not address the prospects for

21   recovery of the listed salmon, expressly and impermissibly omitting that goal from its analysis."

22   Dkt. #19 at 28.

23          In Nat'l Wildlife Fed'n, the Ninth Circuit held that under the jeopardy standard, the

24   consulting agency must consider recovery impacts as well as survival.  481 F.3d at 1238.  As the

25   Court has previously concluded, NMFS reviewed the RMP in its ERD under Limit 6, which

26   ORDER DENYING PLAINTIFFS' MOTION
     FOR SUMMARY JUDGMENT AND
     GRANTING DEFENDANTS' CROSS-
     MOTION FOR SUMMARY JUDGMENT      -21-

expressly requires consideration of recovery and survival, requiring a determination "that implementing and enforcing the joint tribal/state plan will not appreciably reduce the likelihood of survival and recovery of affected threatened ESUs." 50 C.F.R. § 223.203(b)(6)(i). As plaintiffs correctly acknowledge in their motion, the "BiOp is intimately linked to the ERD" and its "analysis of harvest impacts relevant to this case is identical, or nearly so, to the portions of the ERD." Dkt. #19 at 14. Given that the BiOp's analysis is the same as the ERD, coupled with the fact that the ERD considered recovery and survival, plaintiffs' assertion that the BiOp did not consider recovery and survival fails. See Dkt. #19 at 28.

Plaintiffs also contend that NMFS's no-jeopardy determination in the BiOp was contrary to law for the same reasons they contend that NMFS's determination was contrary to the 4(d) Rule: "NMFS's derivation of a 'viable' population does not seek recovery, but seeks only to maintain a depressed population under 'current habitat carrying capacity.'" Id. at 29. The Ninth Circuit in Nat'l Wildlife Fed'n, stated that the recovery requirement "simply provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." 481 F.3d at 1241.

In its decision and the BiOp, by using the RAP, NMFS analyzed recovery risks by utilizing rebuilding exploitation rates. In discussing the viable population under current conditions, NFMS concluded that "viable and critical thresholds in the context of this evaluation are a level of spawning escapement associated with rebuilding to recovery, consistent with environmental conditions. For most populations, these thresholds are well below the escapement levels associated with recovery, but achieving these goals under current conditions is a necessary step to eventual recovery when habitat and other conditions are more favorable." AR 3 at 25; see Nat'l Wildlife Fed'n, 481 F.3d at 1236 ("Agency action can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -22-

condition.") (emphasis added).  Therefore, the Court concludes that NMFS appropriately considered the impacts on recovery against the required jeopardy standard.

### b.  Best available scientific information

Section 1536(a)(2) of the ESA requires that the BiOp must be based on the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  Plaintiffs contend that NMFS violated this requirement by failing to consider what plaintiffs consider to be the best available scientific information—the TRT and the VSP concept of viability—in the BiOp's no-jeopardy determination.  See Dkt. #19 at 29.  Plaintiffs' arguments replicate their objections to NMFS's approval of the RMP and are unavailing in the context of the BiOp for the same reasons as discussed above in sections II.D.1.a(i) and (iv).

Furthermore, as this Court has previously stated, "when there is competing scientific data or expert opinions, a court should defer to the agency's technical expertise 'even if, as an original matter, a court might find contrary views more persuasive.'"  Ctr. for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223, 1236 (W.D. Wash. 2003) (quoting Marsh, 490 U.S. at 378).  Plaintiffs rely on Conner v. Burford, 848 F.2d 1441 (9th Cir. 1988) for the proposition that if there is any question as to the best available scientific information, the Court should "'give the benefit of the doubt to the species," and this Court's prior conclusion in Ctr. for Biological Diversity that deference to the agency is "warranted only when the agency utilizes, rather than ignores, the analysis of its experts."  Dkt. #19 at 30 (quoting Conner, 848 F.3d at 1454; Ctr. for Biological Diversity, 296 F. Supp. 2d at 1239).  Significantly in both Conner and Ctr. for Biological Diversity, however, the courts found that the agencies ignored available biological information.  Conner, 848 F.3d at 1454 (stating "the FWS cannot ignore available biological information"); Ctr. for Biological Diversity, 296 F. Supp. 2d at 1239 (finding "NMFS ignored its experts' conclusions").  Here, as discussed in sections II.D.1.a(i) and (iv) above, NMFS did not ignore the work of the VSP or the TRT.  Given this fact, and the competing data,

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -23-

the Court defers to NMFS's technical expertise and concludes that NMFS did not act arbitrarily or capriciously with respect to its determination of the best available science in the BiOp.

### 3.      Reinitiation of Section 7 Consultation on the RMP

Under 50 C.F.R. § 402.16:  "Reinitiation of formal consultation is required and shall be requested by the federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: . . . (b) [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; [or] (c) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion[.]"

Plaintiffs claim that four specific events have occurred since issuance of the BiOp that should have caused NMFS to reinitiate consultation.  See Dkt. #19 at 31.  The Court discusses these events below.

### a.      Canadian harvest

Plaintiffs first contend that the RMP was based on assessment of the combined effect of fisheries in Canada as well as the United States, and because impacts of the timing of the Canadian harvest are greater than anticipated, NMFS should have reinitiated consultation on the RMP.  See Dkt. #19 at 32 (citing AR 3 at 15-18, 50-58, 61-66).  As an initial matter, the Court notes that the BiOp recognized the potential of an increased Canadian harvest.  See AR 4-3 at 12-13; Dkt. #30 at 36.  Plaintiffs contend in response, however, that "[t]his misses the point" because while the changes in the Canadian fishing industry started in 2000 the effects were not understood until 2006.  Dkt. #34 at 27.  To support this argument, plaintiffs cite to a Pacific Salmon Commission's Chinook Technical Committee report from July 2006 (the "CTC report").  See AR 274 (CTC report); Dkt. #19 at 15 (citing CTC report).  As plaintiffs concede, citing the CTC report, "[i]t is difficult to evaluate the impact of Canada's timing shift on specific

1  populations, because of limits on the available . . . data."). Dkt. #19 at 16. Nevertheless, using

2  the example of the Nooksack Spring Fingerlings, plaintiffs assert that available data shows that

3  Canada's harvest rates on Puget Sound populations are higher than expected. Id. Plaintiffs note

4  that the average exploitation rate in the West Coast Vancouver Island fishery was nearly 24%

5  during 2002-2004, but that since NMFS expected an exploitation rate in Canadian fisheries in

6  the Nooksack River spring chinook of 18%, this new information requires NMFS to reinitiate

7  consultation. Id.; Dkt. #35 at 19.

8      In response to plaintiffs' motion on this issue, NMFS contends that "the increased

9  Canadian harvest on the two populations did not trigger reinitiation because it reflects annual

10  impacts and is only a piece of a comprehensive whole year class ("brood-year") productivity

11  evaluation that requires multi-year data and is done every five years." Dkt. #30 at 36 (citing AR

12  3 at 80-81; AR 15 at 59 (listing the assessments to be done every five years). NMFS ultimately

13  asserted, therefore, that "it would be premature to reinitiate based on the CTC Report, because

14  until its data is incorporated into the brood-year analysis, its significance is not known, and so is

15  not the basis for reconsideration of the ERD, nor does it indicate whether any alteration of the

16  RMP is needed." Id. at 36-37. Plaintiffs have failed to rebut NMFS's conclusion on this factual

17  issue. See Dkt. #34 at 17. Courts are "deferential to the agency's expertise in situations, like

18  that here, where 'resolution of this dispute involves primary issues of fact.'" Arizona Cattle

19  Growers' Ass'n, 273 F.3d at 1236 (quoting Marsh, 490 U.S. at 377). Accordingly, the Court

20  defers to NMFS's technical expertise and concludes that NMFS's decision not to reinitiate

21  consultation on the Canadian harvest was not arbitrary or capricious.

22          **b.    Puget Sound Recovery Plan**

23      After issuance of the BiOp, NMFS in 2007 adopted a Puget Sound Recovery Plan. See

24  72 Fed. Reg. 2493 (Jan. 19, 2007). This recovery plan is comprised of a comprehensive plan

25  submitted by a regional forum of interests, Shared Strategy for Puget Sound (AR 269), and a

26  ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                -25-

supplement prepared by NMFS to include all ESA's required elements (AR 270).  Plaintiffs assert that the 2007 recovery plan's recognition of the 2002 TRT viability planning ranges and recovery criteria, the VSP parameters as applied to identify viable populations, and the recovery plan's steps of implementation between 2005 and 2015 constitute "new information" requiring reconsultation under 50 C.F.R. § 402.16(b).  See Dkt. #19 at 17-18; 32-33; Dkt. #34 at 28.

The Shared Strategy plan, however, incorporates the RMP as the salmon harvest component of the recovery plan, and states that should there be a conflict between the RMP and the plan, the "RMP shall take precedence."  AR 269 at 420.  Reinitiation is triggered under § 402.16(b) only if the "effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  Id. (emphasis added).   The formal adoption of the recovery plan, when the RMP is incorporated as a governing document of the recovery plan, cannot reasonably be considered "new information" requiring reinitiation of consultation on the RMP.  Plaintiffs' claim is unavailing for this reason.

### c. Legal differentiation between marked and unmarked salmon

In 2005, NMFS amended the then-existing 4(d) Rules, including the rule for Puget Sound Chinook, to apply their protection to both natural fish and hatchery fish with an intact adipose fin.  See 70 Fed. Reg. 37160, 37195 (June 28, 2005); 50 C.F.R. § 223.203(a) ("The prohibitions of section 9(a)(1) of the ESA . . . relating to endangered species apply to anadromous fish with an intact adipose fin that are part of the threatened species of salmonids listed in § 223.102(a)").

Plaintiffs contend that the "new" legal differentiation between marked and unmarked salmon, and the express protection for all unmarked Puget Sound Chinook is "new information" and should have caused NMFS to reinitiate consultation.  See Dkt. #19 at 33-34.  Plaintiffs, argue, without any evidentiary support, that the RMP does not require that fisherman do anything to protect unmarked salmon, and as a result, under the RMP fisheries have a greater impact on threatened Chinook than NMFS recognized before it drew this distinction.  Because

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

plaintiffs fail to support this assertion with any evidentiary support from the record, the Court cannot conclude that NMFS's decision not to reinitiate consultation on this issue was arbitrary or capricious.

### d.    Escapement data

Finally, plaintiffs contend that a March 2006 e-mail from a NMFS scientist presents a "gloomy assessment" of the data on salmon returns for key populations in the Hood Canal and Geogia Strait regions, thereby requiring NMFS to reinitiate consultation to determine whether fisheries are jeopardizing the survival and recovery of Puget Sound Chinook.  See Dkt. #19 at 34-35 (citing AR 272 (e-mail)).

The e-mail's author emphasized, however, that the data contained in the escapement spreadsheet attached to the e-mail was a "preliminary look" and "only part of the picture since the information on exploitation rates is not yet available."  See AR 272; 272-1.

Based on this e-mail alone, the Court cannot conclude that NMFS's failure to reinitiate consultation because of a "preliminary look" at a 2006 escapement data spreadsheet is arbitrary or capricious.  As section 4.0 of the BiOp expressed, NMFS recognized the RMP's adaptive management policy, and considered that even a change in escapement goals would not be considered material to reinitiate consultation.  See AR 2 at 40-41.  Accordingly, plaintiffs have not shown that the preliminary escapement data in the attachment to the e-mail "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16.

### III.  CONCLUSION

For all of the foregoing reasons, the Court DENIES plaintiffs' motion for summary judgment (Dkt. ##18, 19) and GRANTS and defendants' cross-motion for summary judgment (Dkt. ##30, 31).  The Clerk of Court is directed to enter judgment accordingly.

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT                    -27-

1

DATED this 20th day of March, 2008.

2

3

*MMS Lasnik*

4

Robert S. Lasnik
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT

-28-